

**SIGNED this 29th day of September, 2023**

Rachel Ralston Mancl
UNITED STATES BANKRUPTCY JUDGE

_____

[This opinion is not intended for publication as the precedential effect is deemed limited.]

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re<br><br>RICHARD CLIFFTON WISE JR.<br>and PAMELA JOYCE WISE,<br><br>Debtors. | No. 2:19-bk-51715-RRM<br>Chapter 7 |
| DALLAS SCISM and<br>JESSICA SCISM,<br><br>Plaintiffs,<br><br>vs.<br><br>RICHARD CLIFFTON WISE JR.<br>and PAMELA JOYCE WISE,<br><br>Defendants. | No. 2:22-ap-05005-RRM<br>Adversary Proceeding |

### M E M O R A N D U M

APPEARANCES:

| | |
|---|---|
| Richard Phillips, Esq.<br>109 East Main Street, Suite 2<br>Jonesborough, Tennessee 37659<br>*Attorney for Plaintiffs* | Dean Greer, Esq.<br>2809 East Center Street<br>Kingsport, Tennessee 37664<br>*Attorney for Defendants* |

**Rachel Ralston Mancl, United States Bankruptcy Judge**.   In this adversary proceeding plaintiffs Dallas and Jessica Scism seek a determination that their claim against debtors Richard and Pamela Wise is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (6).   Debtors deny the claim falls within either category, assert that the claim was discharged in the underlying bankruptcy case, and request an award of damages for plaintiffs' violation of the discharge injunction.   A trial having been conducted, the court concludes that plaintiffs' claim was discharged, but plaintiffs' actions did not violate the discharge injunction.

I.

This dispute turns on the interpretation of a "Rent to Own" contract concerning residential property subject to a deed of trust and requires a determination of whether debtors falsely represented their intention to perform the contract.   The parties agreed that plaintiffs could acquire ownership of the property by making rental and certain other payments beginning March 2017 and ending June 2023 or earlier if plaintiffs chose.   Debtors defaulted under the contract after the monthly payment on the loan secured by the deed of trust substantially increased in March 2019. Debtors notified plaintiffs of their plan to surrender the property in a chapter 7 bankruptcy, advised them to contact the loan servicer to work out financing if plaintiffs desired to keep the property, and refused to accept any more of plaintiffs' payments.   Debtors filed a chapter 7 bankruptcy on August 22, 2019, but plaintiffs were not timely notified of the case or entry of the discharge on January 2, 2020.

On April 28, 2021, plaintiffs filed a general sessions civil warrant in Washington County, Tennessee, seeking to recover from debtors the money paid to them for the property.   The action eventually found its way to the circuit court where debtors moved for summary judgment based on the claim having been discharged in bankruptcy.   The issue of whether the claim was discharged prompted plaintiffs to file a motion to reopen the underlying bankruptcy case on July 5, 2022, stating "[t]he Circuit Court has deferred to this Court for declaratory judgment on this issue."   An order was entered September 15, 2022, reopening the case to the extent plaintiffs desired to commence an adversary proceeding in accordance with 11 U.S.C. § 523(a)(3)(B). Plaintiffs did so by filing their complaint on October 12, 2022.   Debtors answered the complaint on November 21, 2022, and filed a motion for contempt in the underlying case seeking damages from plaintiffs for violation of the discharge injunction in connection with filing and pursuing both

2

the state court action and this adversary proceeding. With consent of the parties' attorneys the motion for contempt was consolidated for discovery and trial with this action by scheduling order entered December 21, 2022. A joint pretrial statement filed by the attorneys for the parties on June 15, 2023, listed the issues to be decided by the court and summarized the parties' positions. At the start of the trial held on June 29, 2023, plaintiffs announced they were only seeking a determination of dischargeability and would return to state court for a money judgment if the claim was not discharged. The parties were the only witnesses at the trial. The live and deposition testimony of each party concerning the formation and performance of the contract was similar such that for the most part there were no disagreements as to the material facts. The parties' deposition transcripts along with pertinent documents including the contract, rental payment receipts, loan agreements and statements, summaries of loan payments, and filings in the state court action were submitted as evidence. Regardless of whether specifically referenced in this memorandum opinion, the court has considered all the evidence.

II.

The debtors were each widowed before their marriage to one another. Debtor Richard Wise was the owner of a house and lot located at 1308 East Myrtle Street in Johnson City, Tennessee, in which he and previous wife had resided. After her death and that of the previous husband of debtor Pamela Wise, the debtors married and have resided together in a house she owns. Mr. Wise kept the Myrtle Street house as rental property while attempting to maintain the payments on a 20-year loan secured by the property that he and his previous wife had obtained in May 2003. In early 2017 the Myrtle Street house was empty, and Mr. Wise was "fixing to let it go back" because he could no longer afford to keep it. Plaintiffs were looking for a place for their family to live. Mr. Scism liked the location of the property because it was close to his parents and would enable his children to attend city schools and participate in after-school programs. According to plaintiffs, while they knew the property was subject to a loan that debtors could not afford, they were not aware Mr. Wise was behind on the payments. He was.

On March 3, 2017, the parties signed a document titled "Rent to Own" that debtors had put together from some internet sources. Although details usually found in such contracts were missing, the essential term was present: "the deed" would "be signed over" after plaintiffs made an initial "down payment" of $1,000, 81 monthly rental payments of $450 from March 2017

3

through November 2023, a "balloon payment" of $5,300 on March 1, 2018, and a final payment of $4,719.17 on December 1, 2023. These payments totaled $47,469.17. No mention was made of the existing deed of trust or the outstanding loan. Plaintiffs were provided the option to purchase the property "at any time." Presumably, as the contract was silent in this regard, exercising the option would have required plaintiffs to pay off the balance of the remaining payments under the contract. Other than Mr. Wise's statement that the originally proposed "down payment" of $2,000 was cut by half in consideration of some work needed on the house before plaintiffs could move in, there was little evidence of how the parties arrived at the total payments under the contract. Plaintiffs stated they were getting the property "at cost." While Ms. Scism explained that this meant they were "getting the property for what debtors owed on it," neither of the plaintiffs were aware how much was owed on the loan when the contract was signed. Concerning the value of the property, the only evidence was from Mr. Wise who said the property tax appraisal was "like $50,000" in 2014.

In March 2017 plaintiffs made a $450 rental payment for that month, paid the $1,000 "down payment" and paid $5,400 for a year of rent in advance. In February 2018, with the $5,300 "balloon payment" coming due on March 1, Mr. Scism stated he had decided to abandon the purchase and leave the property when the year of paid-up rent ended the next month on March 31. As for the reason, Mr. Scism said he had been led to believe that a bank in Elizabethton, Tennessee, was holding the loan so that after the first year he would be able to go with Mr. Wise to the bank to make sure "everything's all good" with "payments being made." Mr. Wise denied this. Mr. Wise said Mr. Scism was "having a hard time because there was a $5,300 balloon payment" and he "didn't want to pay that." Mr. Wise said after he told Mr. Scism that the loan servicer had sent "some papers here that the house payment had come down," Mr. Scism responded that if the monthly payment was coming down he would make the "balloon payment."

That led to the signing of a second "Rent to Own" document on February 26, 2018. The significant differences between the two "Rent to Own" documents are a lowered monthly payment of $198.20 going forward and a change in the final payment amount and date from $4,719.17 on December 1, 2023, to $4,716.70 on June 1, 2023, "when this agreement will be honored and the deed will be signed over to the Scisms as soon as the Wise[s] receive the deed." The second "Rent to Own" document provided that "[t]he house payment will drop $171.80," but "[i]f renters

4

want to keep the insurance that [the loan servicer] provides, the payment will be $198.20 per month." Mr. Wise said plaintiffs chose to keep the insurance in place and pay the higher payment. No explanation was given as to why the parties agreed to shorten the contract by moving the final payment amount up to June 2023 from December 2023 or for the negligible change in the final payment amount. The replacement of the original 81 monthly payments of $450 with 13 monthly payments at $450 and 62 monthly payments of $198.20 greatly reduced the total payments from $47,469.17 under the first "Rent to Own" document to $29,155.10 under the second document. Plaintiffs made the $5,300 "balloon payment" and again paid one year of rent in advance through March 2019, though this time the amount was only $2,378.40.

In January 2019 the loan servicer notified Mr. Wise that his present loan payment of less than $200 would more than quadruple to almost $900 beginning March 2, 2019. Mr. Wise sent a certified letter to Mr. Scism dated February 9, 2019, saying he had been "shocked" to find out the loan servicer was now requiring 54 monthly payments of $889 to pay off the loan due to the ending of a modification. Mr. Wise wrote, "I'm not going to deal with it anymore," and "I'm in the middle of chapter 7 bankruptcy and I'm adding this loan and you to my bankruptcy." Mr. Wise suggested to Mr. Scism that he contact the servicer about "getting the loan in your name or something else," or if not "you can live in the house until it goes through bankruptcy." Although the certified letter was not accepted by plaintiffs, Mr. Wise provided the letter to plaintiffs' attorney in March 2019 when signing documents permitting plaintiffs to deal with the loan servicer directly.

Plaintiffs sent debtors a rental payment of $198.20 for April 2019, but Mr. Wise returned it to plaintiffs' attorney. For almost three years thereafter plaintiffs resided in the house without making a payment to anyone. Mr. Scism said he saved up his money during that time and used it to purchase the property for $35,000 cash from the bank that foreclosed the deed of trust. Ms. Scism stated that the purchase occurred on February 23, 2022. Plaintiffs' receipts evidence they paid debtors a total of $14,528.40 under the contract. The combined sum plaintiffs paid to acquire ownership of the property was $49,528.40, which is only $2,059.23 more than the $47,469.17 in payments required by the first "Rent to Own" document.

### III.

Mention was made of plaintiffs not having timely notice of debtors' bankruptcy filing.

5

Plaintiffs were omitted as creditors in the bankruptcy case due to an inadvertent failure by debtors' attorney to include plaintiffs on the list of creditors and schedule the debt in accordance with 11 U.S.C. § 521(a)(1). Having been omitted from the mailing list, plaintiffs did not receive the formal notice of debtors' bankruptcy filing from the clerk of court. Had the plaintiffs received it, that notice would have included the deadline of November 18, 2019, "to challenge whether certain debts are dischargeable." The clerk was required to provide notice of that deadline to creditors by Fed. R. Bankr. P. 2002(f)(5) and 4007(c).

The question of whether plaintiffs' claim was nonetheless discharged is answered by § 523(a)(3). A debt "of a kind specified in paragraph (2), (4), or (6)" of § 523(a) that is "neither listed nor scheduled … in time to permit … timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs" is not discharged "unless such creditor had notice or actual knowledge of the case in time for such timely filing and request." 11 U.S.C. § 523(a)(3)(B). The timely filing of a proof of claim is not at issue here. No deadline for filing claims was set in debtors' case because there were no assets to distribute to creditors. The only issue is whether plaintiffs had notice or actual knowledge of debtors' bankruptcy case in time to file their complaint before the deadline of November 18, 2019. If not, a complaint for such a determination may be filed at any time either in bankruptcy or state court. *See, e.g., In re Jenkins*, 330 B.R. 625, 631 (Bankr. E.D. Tenn. 2005). If the court considers the complaint and determines the debt is not of a kind specified in paragraphs (2) or (6) of § 523(a) as plaintiffs insist, then the debt was discharged "the moment [plaintiffs] receive[d] notice or knowledge of the bankruptcy case." *In re Madaj*, 149 F.3d 467, 470 (6th Cir. 1998). At the earliest that would have been in October 2021 when plaintiffs were served with the motion for summary judgment in the state court action.

Debtors assert that because plaintiffs' attorney was informed in March 2019 that debtors intended to file bankruptcy, plaintiffs should have made inquiries thereafter to find out if a case had been filed. Although Mr. Wise wrote in February 2019 that he was "in the middle of chapter 7 bankruptcy," no case had been filed at that time. Debtors were making payments on the fee required by their bankruptcy attorney before he would file their case. It was not until August 22, 2019, that debtors filed their case. To successfully assert the affirmative defense that plaintiffs' claim was discharged, the burden of proof is on debtors to establish plaintiffs had notice or actual

6

knowledge of the bankruptcy filing in time to meet the deadline for requesting a dischargeability determination. *See, e.g., Bernard v. Kull (In re Bernhard)*, 639 B.R. 117, 137 (Bankr. E.D. Pa. 2022). There is no evidence that plaintiffs did. Plaintiffs were under no obligation to make inquiries from March through August 2019 to discover if debtors followed through on their previously stated intention to file a bankruptcy case. Accordingly, the court will consider the merits of plaintiffs' present complaint.

Plaintiffs allege in their complaint they "would not have entered into the Agreement … if they had not relied on Defendants' false representations to-wit: that they would convey good title to the House to the Plaintiffs after the Plaintiffs had performed their requirements under the Agreement." Specially, plaintiffs allege that debtors "intended to deceive the Plaintiffs into entering the Agreement" because debtors "knew at the time they entered into the Agreement that they would not make timely payments on the note against the House, and would thereby cause the House to go into foreclosure, depriving Plaintiffs of their benefits of the Agreement." Plaintiffs reiterate in the joint pretrial statement that debtors "knew, based on their history, the financial status, and the repayment structure of the loan, that they would not be able to pay off the house and, therefore, would ultimately breach the agreement with the Plaintiffs.… The question, then, is whether Defendants falsely represented to the Plaintiffs that they were willing and able to pay the house off." The court will examine both prongs of this question—willingness and ability—separately.

Plaintiffs frame the question as whether debtors falsely represented their willingness and ability to pay off the loan. However, there were not any representations in the contract or other evidence of promises made by debtors as to either their willingness or ability to pay the loan. The second "Rent to Own" document did contain the representation that after the final payment "this agreement will be honored and the deed will be signed over to the Scisms as soon as the Wise's [sic] receive the deed." The use of this language by debtors in drafting the document indicates an unfamiliarity with real property transfers and secured financing. Mr. Wise already held the deed to the property, but subject to a deed of trust. Conveyance of ownership of the property would require execution of another deed. In any event, the language chosen by debtors does imply that the property would be conveyed free of the deed of trust upon plaintiffs' completion of payments under the contract. To do so, of course, required that the loan be paid off. The essence of

7

plaintiffs' claim is that debtors falsely represented their intention to perform the contract that by implication required the loan to be paid off. *See* 11 *Williston on Contracts* § 31:7 (4th ed.) ("[M]ost contracts include implied terms that are indispensable in effectuating the intentions of the parties.").

> Section 523(a) of the Bankruptcy Code provides in pertinent part:
>
> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>> ....
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition [or]
>>
>> ....
>> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]
>
> 11 U.S.C. § 523(a).
>
> To prevail on a nondischargeability complaint under § 523(a)(2)(A), a creditor must demonstrate that the debtor intended to defraud the creditor, and to succeed under § 523(a)(6) the creditor must show that the debtor intended to injure the creditor or the creditor's property. *See Duley v. Thompson (In re Thompson)*, 528 B.R. 721, 740 (Bankr. S.D. Ohio 2015). The creditor must prove the element of intent by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991). If the creditor fails to do so, then the other elements required to establish nondischargeability under each subsection need not be addressed. *See Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 283 (6th Cir. 1998).

*Cabrera v. Wilson (In re Wilson)*, 613 B.R. 907, 920 (Bankr. S.D. Ohio 2020); *see also Yoppolo v. Asbury (In re Asbury)*, No. 12-3082, 2014 WL 1323216, at *7 (Bankr. N.D. Ohio March 31, 2014) (omitted creditor must prove merits of its claim under § 523(a)(2), (4) or (6)).

Upon entering a contract a debtor makes the representation that he intends to perform under the contract. *See In re Wilson*, 613 B.R. at 921. "[I]t is clear that any debtor who does not intend to perform a contract from its inception has knowingly made a false representation." *Stifter v. Orsine (In re Orsine)*, 254 B.R. 184, 188 (Bankr. N.D. Ohio 2000). The appropriate time to measure the intent of a debtor not to perform a contract is at the moment of its formation. *See*

8

*Webb v. Isaacson (In re Isaacson)*, 478 B.R. 763, 775 (Bankr. E.D. Va. 2012). "Although the intent to defraud must generally arise at the same time as the debt, the debtor's subsequent conduct may help to shed light on the debtor's state of mind at the time of the transaction." *Risk v. Hunter (In re Hunter)*, 535 B.R. 203, 213 (Bankr. N.D. Ohio 2015). "Whether a debtor possessed an intent to defraud a creditor … is measured by a subjective standard." *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). "What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent. This determination will require a review of the circumstances of the case at hand …." *Id.* at 282 (quoting *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 334 (Bankr. N.D. Ill. 1995)). Therefore, if the court finds from the totality of the circumstances that debtors' conduct was consistent with a subjective intent to repay the loan, the inquiry as to the dischargeability of plaintiffs' claim under § 523(a)(2)(A) will end. *See id.* at 282-83.

Concerning the contention that debtors were unwilling to repay the loan, plaintiffs' evidence focused on the differences between the amounts of the monthly rental payments and the monthly payments made on the loan. Ms. Scism said debtors told plaintiffs they were getting the property "at cost" and that what plaintiffs paid to debtors "was going straight to the bank." Based on those statements Ms. Scism said she understood that the $450 monthly payment under the first "Rent to Own" document was equal to debtors' monthly loan payment. Ms. Scism pointed out using debtors' monthly loan statements that debtors paid less than $450 each month on the loan in the first year of the contract. The monthly loan payments ranged from $343.60 to $358.60. In the second year of the contract when plaintiffs' payments under the contract fell to $198.20 monthly, debtors' monthly payments on the loan ranged from $171.80 to $200. Plaintiffs contend that the comparison of total payments they made under the contract with the debtors' total loan payments is proof debtors never intended to pay off the loan. As stated earlier, plaintiffs paid debtors a total of $14,528.40 under the contract. The loan statements from March 2017 to January 2019 credit Mr. Wise with $10,813.20 in payments. Ms. Scism said she was uncertain if the "down payment" of $1,000 included in the total of contract payments was to have been paid by debtors on the loan. If the "down payment" was not, the difference between the two totals is $2,715.20.

9

Some background of the loan is necessary to put this evidence in context. Mr. Wise and his previous wife took out a $50,000 loan in May 2003 that carried an interest rate of 8.5% and was secured by the deed of trust on their Myrtle Street house. Repayment of the loan required monthly payments of $433.92 over 20 years. In February 2014 Mr. Wise signed a "Foreclosure Forbearance Agreement – Limited Term Interest Only." At that time the loan balance was $40,287.35, consisting of $36,008.70 in unpaid principal, $3,142.70 in unpaid interest, and $1,135.95 in other unpaid amounts. Under the forbearance agreement $4,278.65 in unpaid interest and other amounts was deferred until the loan maturity date. Additionally, for the five-year term of the agreement ending February 2019 the interest rate on the unpaid principal was lowered to 4% and the monthly payment changed to "interest only" in the amount of $119.63. After inclusion of the escrow for hazard insurance of $52.17 the total monthly payment was $171.80. That payment remained the same up through the loan statement dated February 16, 2017, that showed Mr. Wise was six months behind on the monthly payments. The "amount due" on the statement was $7,206.03 including the past due payments and other charges. The "principal bearing interest" was $35,889.41 and "deferred principal" was $4,719.17. That was the status of the loan at the time the first "Rent to Own" document was signed.

Mr. Wise testified that after plaintiffs expressed an interest in acquiring the property, he contacted the loan servicer Select Portfolio Servicing ("SPS") to see if they could "work something out." Mr. Wise said the loan servicer set up a "modification" that would increase the monthly payment to $354. Based on that amount Mr. Wise set the monthly rental payment at $450. When asked about the difference between the two amounts, Mr. Wise responded, "Nobody sells for rent to own for the exact amount of the mortgage" and "aggravation is worth something" in case "they move out" or "tore up something." The loan statement of March 17, 2017, reflected a change brought about by the loan servicer's response to Mr. Wise's request for assistance. In place of the former "amount due" of $7,206.03 was the statement "Payment Due Under Forbearance / Trial Plan Agreement." And in the box entitled "Explanation of Amount Due" the former monetary figures were replaced with this statement:

> Our records indicate you have entered into a Repayment Plan. This plan temporarily supersedes your original loan payment arrangements and may provide a different payment amount or due date than those set forth in your original loan documents. Prior to your agreement your contractual monthly payment was $171.80, however please note that you are required to remit payments in the

10

amounts and on the dates set forth in your Forbearance / Trial Plan Agreement.

The March 2017 statement also reflected receipt of Mr. Wise's payment of $343.60 that apparently had become the new payment amount due under the Repayment Plan because Mr. Wise continued thereafter to make monthly loan payments in that amount or slightly greater.

In October 2017 the loan service was transferred to Rushmore Loan Management Services who ended the Repayment Plan. The first statement from Rushmore dated October 24, 2017, listed an "amount due" of $2,754.78 and a reinstated monthly payment of $171.80. However, Mr. Wise continued to make payments of $343.60 through February 2018. The loan statement of March 9, 2018, listed payments received from Mr. Wise totaling $5,488.03. That would have been in the same period in which plaintiffs paid the $5,300 "balloon payment." From that point on through the end of 2018 Mr. Wise made monthly payments in amounts that varied from $171.80 to $200. Part of the reason for this was an increase in the monthly payment to $181.87 in June 2018 due to an additional escrow. Mr. Wise said he just paid whatever amount was stated in the monthly invoice he received from the loan servicer. By January 2019 Mr. Wise was almost caught up on the loan. The loan statement dated January 16, 2019, listed $363.74 as the amount due which included only one past due monthly payment of $181.87. Unfortunately, that was also the month that Mr. Wise learned his monthly loan payment would be going up to $889.73. Beginning with the payment due for February 2, 2019, Mr. Wise ceased making payments on the loan.

Rather than proving debtors were unwilling to repay the loan, debtors' course of conduct during the contract establishes just the opposite. Mr. Wise made payments regularly and brought the "amount due" from $7,206.03 in February 2017 down to $181.87 in January 2019.

> [A] debtor acting with the intent to defraud will not generally undertake measures to perform their obligation. *Accord Anastas v. American Savings Bank (In re Anastas),* 94 F.3d 1280, 1285 (9th Cir. 1996). And logically, the opposite also holds true; where a debtor undertakes significant steps to perform as promised, any inference of fraud is muted. On whole then, a type of an inverse relationship exists when weighing a debtor's intentions: the further the extent of performance, the less likely there exists fraud. To use a simple credit transaction as an example, it is the highly unusual situation where a person taking extensions of credit—e.g., cash advances—with the present intention of converting the funds will make any meaningful attempt to repay the obligation. *Minnesota Client Sec. Bd. v. Wyant (In re Wyant)*, 236 B.R. 684, 695 (Bankr. D. Minn. 1999) (timely and substantial

11

payments are inconsistent with a debtor's intent to incur debt without repaying it).

*Mack v. Mills (In re Mills)*, 345 B.R. 598, 605 (Bankr. N.D. Ohio 2006). Debtors took significant steps to maintain the loan until being informed the loan payment was increasing by approximately $700 a month.

Debtors did receive $4,715.20 more in payments from plaintiffs than what debtors paid on the loan. Considering that difference, plaintiffs attempted to show with categories of expenses taken from debtors' bank statements during the two years of the contract that debtors were spending frivolously in lieu of paying more on the loan. The court does not find debtors spent frivolously or even lived above their means during the period. Debtors, both retired and dependent upon limited income from social security, were providing for not only themselves but also for Ms. Wise's four small grandchildren. Moreover, the contract did not require that all the rental payments debtors received had to be applied in payment on the loan. Plaintiffs may have understood from conversations with debtors that the rental payments were being applied in this manner. However, the debtors did not breach the contract by not paying the same amount on the loan that they received as rental payments under the contract.

Now, regarding the contention that debtors did not have the ability to pay off the loan, plaintiffs brought out that debtors had no resource other than the contract payments from which to make the loan payments and that there was no way the payments under the contract would be sufficient to pay off the loan. During closing debtors' attorney agreed with this assessment, particularly since the monthly rental payment had been lowered, and explained that debtors put together the rudimentary "Rent to Own" documents from internet sources and without the assistance of anyone knowledgeable in such transactions. From the evidence in this respect the court is certain that debtors did not comprehend the information on the loan statements and lacked a fundamental understanding about the financing associated with the loan.

When asked whether he knew that the payments he was making were "interest only" and that none of the loan principal was being reduced, Mr. Wise answered that the loan statements from SPS indicated a portion of the payments were being escrowed to be later applied to the principal under the terms of the Repayment Plan. However, the loan statement of February 16, 2017, and the loan statement of January 16, 2019, list the identical amounts for outstanding

principal and deferred principal of $35,889.41 and $4,719.17, respectively. The increased payments under the Repayment Plan were simply being applied to reduce the balance of the past due payments. When presented during his deposition with the statement, "At some point, you did know these were interest only payments," Mr. Wise responded, "Not necessarily. I couldn't tell you right now if that payment was all interest payment. Wouldn't nobody have that answer but Rushmore." When Mr. Wise was asked about his general understanding of how mortgage payments work, his response was, "You pay what the statement said was owed each month," and "If you don't pay it they foreclose." When talking about how he arrived at the payments he set up in the "Rent to Own" documents, apparently Mr. Wise was confused when he said he got the $5,300 figure for the "balloon payment" from Rushmore. SPS was the loan servicer when the first "Rent to Own" document was signed. The amount for the "balloon payment" may have come from SPS as well as because the amount for the final payment of $4,719.17 is the same amount as the deferred principal amount listed on the monthly loan statements.

In whatever way debtors may have come up with the payment structure in the contract, the court finds no dishonesty with their attempt to come up with a workable agreement whereby plaintiffs could ultimately "Rent to Own" the Myrtle Street house. Mr. Wise's lack of understanding about the financing of his loan and his failure to realize that the payments he was making were "interest only" also leads the court to conclude that the debtors sincerely thought the loan could be paid off from the payments they were to receive under the contract. Though in fact the contract may have been doomed to failure from the beginning because it would not produce sufficient proceeds to enable debtors to pay off the loan, and it certainly became that way when the monthly rental payment was lowered, that in and of itself does not prove debtors had no intention to perform the contract. The Sixth Circuit Court of Appeals has cautioned courts against conflating inability to repay and intent not to repay in determining whether a false representation was made. *See In re Rembert*, 141 F.3d at 281.

> A debtor who intends to repay a debt using anticipated future income still has an intent to repay notwithstanding significant uncertainty surrounding the receipt of the income. For example, the Sixth Circuit held in *Rembert* that the debtor's conduct "was entirely consistent with a subjective intent to repay" even though her basis for believing she could repay her debts was her anticipation that she "would win enough money" from gambling. *Id.* at 282. And the Sixth Circuit so held despite finding that the debtor's expectations likely were unreasonable: "The fact that Rembert later admitted that it probably was not reasonable to believe that she

13

> would win enough money to repay does not indicate a subjective intent not to repay her debts in this case." *Id.*; *see also Hall v. Jackson (In re Jackson)*, 348 B.R. 595, 599 (Bankr. M.D. Ga. 2006) ("A debtor's honest belief that a debt would be repaid in the future, even if in hindsight found to have been very unrealistic, negates any fraudulent intent.") (quoting 4 *Collier on Bankruptcy* ¶ 523.08[1][d] (15th ed. rev. 2006)).

*In re Wilson*, 613 B.R. at 921.

Even though *Rembert* involved the representation made by a cardholder in a credit card transaction, by analogy its holding is equally applicable here. The court reasoned that "[t]o measure a debtor's intention to repay by her ability to do so, without more, would be contrary to one of the main reasons consumers use credit cards: because they often lack the ability to pay in full at the time they desire credit." *In re Rembert*, 141 F.3d at 281. Similarly, it would run contrary to the purpose for the "Rent to Own" contract if the court were to measure debtors' intention to pay the loan by only their ability to do so at the inception of the contract. Prior to signing the first "Rent to Own" document debtors admittedly could not afford to keep the Myrtle Street house and plaintiffs knew this. Mr. Wise said the reason he did not just let the "[the house] go back" at that time was "because we thought that somebody was needing something and they had children and we were looking, well, if we could help." Mr. Wise recounted that a friend, Gloria, who Mr. Scism called Mom, told him that plaintiffs "had three kids" and "were having a hard time" because Mr. Scism "had just got out of jail" and "they needed a place to live." Mr. Wise's idea of a "Rent to Own" agreement came about because plaintiffs could not afford to buy a house and debtors could not afford to keep one.

Like in *Rembert*, where the court rejected that the act of using a credit card carries an implication that the debtor has the ability to repay the debt, this court concludes that the implied representation made by debtors upon entering the "Rent to Own" contract was not that they had the ability, but that they had the intention to pay the loan. While it may not have been objectively reasonable to believe that the payments from the contract would be sufficient to enable debtors to pay off the loan, the debtors subjectively believed that they would. "If there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *Sequatchie Mountain Creditors v. Lile*, 585 B.R. 426, 443 (N.D. Ohio 2018) (citations to quotations omitted). The court finds from the totality of the circumstances that the conduct of

14

debtors during the two years of the contract was consistent with a subjective intent to repay the loan.

Before leaving the question of dischargeability of plaintiffs' claim under § 523(a)(2)(A), the court observes that plaintiffs also alleged in their complaint that debtors "used familiarity with Plaintiffs' parents" and "false pretenses of religion and morality to fraudulently induce the Plaintiffs into entering the [contract]" and "into paying monies to Defendants pursuant to the [contract]." Plaintiffs did not include these contentions in describing their claim in the joint pretrial statement and they were not developed during the trial. In the event plaintiffs did not abandon these allegations, the evidence at trial proved neither. Plaintiffs did not establish that their claim is nondischargeable under § 523(a)(2)(A).

Plaintiffs also request a determination that their claim is nondischargeable under § 523(a)(6) "for willful and malicious injury by the debtor to another entity or to property of another entity." "[A]ssessing whether an injury is 'willful and malicious' under § 523(a)(6) is a two-pronged inquiry." *MarketGraphics Research Grp., Inc. v. Berge (In re Berge)*, 953 F.3d 907, 916 (6th Cir. 2020). The court "must analyze independently whether a debtor has willfully, and also maliciously, injured the creditor before rendering a debt non-dischargeable in accordance with § 523(a)(6)." *Id.* at 916. "'Willful' conduct, for purposes of § 523(a)(6), requires 'actual intent to cause injury,' 'not merely a deliberate or intentional *act* that leads to injury.'" *Id.* at 915 (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original)). The Sixth Circuit "utilizes only a subjective standard [to measure intent], asking whether the debtor himself was motivated by a desire to inflict injury." *Id.* The debtor must desire to cause the consequences of his act, or believe that the consequences are substantially certain to result from it. *Campbell v. Markowitz (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). "'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).

Plaintiffs allege that debtors "intentionally failed to make timely payments on the note against the House" and that they "knew pecuniary loss was substantially certain to follow [debtors'] failure to make timely payments on the note against the House." At trial plaintiffs also made the point that Mr. Wise intentionally chose not to attempt another loan modification and

15

asserted this was due to debtors' "ill feelings for" and "dislike of" plaintiffs that caused them injury by having to pay more for the property than they otherwise would have under the contract. Mr. Wise repudiated the contract in February 2019 when he sent the letter to plaintiffs advising that he would no longer make the loan payments because they were increasing to almost $900 monthly. The actual breach of contract occurred when debtors refused the April 2019 rental payment. *See Buhler v. Davis (In re Buhler)*, No. 3:22-ap-90090, 2022 WL 17184617, at *4 (Bankr. M.D. Tenn. Nov. 23, 2022) (repudiation occurring before time for party to perform is an "anticipatory breach" or "constructive breach").

"[A] party may intentionally breach a contract with the knowledge that an injury may result, but the nature of the injury is in large part foreseeable and assumed as a part of the risk of doing business. The injury is real, but it is not 'malicious' in the sense that it deserves exception from discharge under the Bankruptcy Code." *Bank of Am., NA v. Killgrove (In re Killgrove)*, No. 11-06687, 2013 WL 7018546, at *12 (Bankr. E.D. Mich. Dec. 30, 2013). In this instance debtors made payments until being notified that the monthly loan payment was increasing to an amount far beyond their ability to pay. Mr. Wise did act "intentionally" in ceasing to make any more payments on the loan upon receiving the notification and he did act "intentionally" in refusing to pursue another modification. However, "[a]n intentional or deliberate act alone does not constitute willful and malicious conduct under § 523(a)(6)." *Kowalski v. Romano (In re Romano)*, 59 F. App'x 709, 715 n.6 (6th Cir. 2003).

The Sixth Circuit Court of Appeals in a 2004 unpublished, non-precedential decision stated that "[c]onsistent with *Geiger*, we have held that a breach of contract cannot constitute the willful and malicious injury required to trigger § 523(a)(6)." *Steier v. Best (In re Best)*, 109 F. App'x 1, 8, (6th Cir. 2004) (citing *Salem Bend Condo. Assn. v. Bullock-Williams (In re Bullock–Williams)*, 220 B.R. 345, 347 (B.A.P. 6th Cir. 1998)). The *In re Best* adversary proceeding involved a state court judgment against the debtors for breach of a stock purchase agreement by failing to refund plaintiff's investment. The circuit court explained why the debtors' conduct in breaching the contract was not a "willful and malicious injury by the debtor."

> [T]he injury must invade the creditor's legal rights. Section 523(a)(6)'s term "willful ... means a deliberate or intentional invasion of the legal rights of another, because the word 'injury' usually connotes legal injury (*injuria*) in the technical sense, not simply harm to a person." *In re Geiger,* 113 F.3d 848, 852 (8th

16

> Cir.1997), *aff'd,* 523 U.S. 57, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998); *accord In re McKnew,* 270 B.R. 593, 640 (Bankr. E.D. Va. 2001); *In re Russell,* 262 B.R. 449, 454 (Bankr. N.D. Ind. 2001). The conduct "must be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice." *In re Mulder,* 306 B.R. 265, 270 (Bankr. N.D. Iowa 2004) (citation omitted).

*In re Best*, 109 F. App'x at 6. The court contrasted this to plaintiff's "state court complaint [that] did not allege that [the] breach was accompanied by tortious conduct." *Id*. at 8.

In remarking that it had "held that a breach of contract cannot constitute the willful and malicious injury required to trigger § 523(a)(6)," the circuit court cited a 1998 opinion from the circuit's bankruptcy appellate panel in *Salem Bend Condo. Assn. v. Bullock-Williams (In re Bullock–Williams),* 220 B.R. 345, 347 (B.A.P. 6th Cir. 1998) (affirming bankruptcy court's decision that debtor did not intend to cause harm to creditor in failing to pay condominium fees for over six years while filing bankruptcy five times). The circuit court omitted mentioning the bankruptcy appellate panel's subsequent decision from 2000 where that panel also cited *In re Bullock-Williams*, but for the proposition that "[u]nder *Geiger*, damages for a breach of contract can be nondischargeable under § 523(a)(6)." *The Spring Works, Inc. v. Sarff (In re Sarff)*, 242 B.R. 620, 626 (B.A.P. 6th Cir. 2000) (citing *In re Bullock–Williams,* 220 B.R. 235). The *In re Sarff* panel expounded that "[t]he plaintiff must, however, show more than just a 'knowing breach of contract' and must prove that the defendant 'intended to cause harm by' breaching the contract." *Id.* (citing *In re Bullock-Williams*, 220 B.R. at 347 (quoting *Geiger*, 523 U.S. at 62)).

> "An ordinary tort or breach of contractual or statutory duty generally is not sufficient to deny discharge under subsection (6) without some aggravating circumstance evidencing conduct so reprehensible as to warrant denial of the 'fresh start' to which the 'honest but unfortunate' debtor would normally be entitled under the Bankruptcy Code."

*In re Sarff*, 242 B.R. at 626 (quoting *Novartis v. Luppino (In re Luppino)*, 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998)).

Although both the circuit court in *Best* and the bankruptcy appellate panel in *Sarff* cited the same case for seemingly opposite propositions, their holdings were consistent. The circuit court held that a breach of contract that was not accompanied by tortious conduct did not constitute a willful and malicious injury. The *Sarff* panel held that that a breach of contract that was

17

accompanied by tortious conduct did constitute a willful and malicious injury. In *Sarff* the bankruptcy court determined that the employer's compensatory and punitive damage awards for the employee's interference with business relations and misappropriation of trade secrets was a willful and malicious injury, but that the employer's breach of contract damages award for return of compensation paid was not. The bankruptcy appellate panel stated that the same conduct gave rise to all the claims, those being the employee's intentionally injuring his employer by competing with it while he had a duty of loyalty to the company, stealing from his employer to aid a competitor, and repeatedly violating an injunction prohibiting him from competing against his employer. *Id*. at 629. Accordingly, the panel held that the breach of contract damages award was also nondischargeable under § 523(a)(6).

In this adversary proceeding, however, plaintiffs have proved nothing more than a knowing breach of contract by debtors. Neither the act of ceasing to make payments nor of refusing to request another loan modification violated any duty to plaintiffs other than perhaps what may have been owed under the contract. "Under Tennessee law, 'it is well settled that a tort cannot be predicated on a breach of contract. A tort exists only if a party breaches a duty which he owes to another independently of the contract.'" *Lingham Rawlings, LLC v. Gaudiano (In re Lingham Rawlings, LLC)*, No. 10-3125, 2013 WL 1352320, at *35 (Bankr. E.D. Tenn. April 3, 2013) (quoting *Calipari v. Powertel, Inc.,* 231 F.Supp.2d 734, 736 (W.D. Tenn. 2002)). Even if a breach of contract by itself could constitute a "willful injury," a "malicious injury" must still be proven. There was no evidence that debtors caused a malicious injury. Debtors' financial inability to make the higher loan payments was a just cause and excuse for allowing the deed of trust to be foreclosed. And though by that time debtors may have had "ill feelings for" and "dislike of" plaintiffs, which they attributed to Mr. Scism's use of profanity and abusive language towards them both, those ill feelings were not the motivation for Mr. Wise's decision to not seek a loan modification. Debtors thought that another loan modification would have been futile as their credit "stunk" in the words of Mr. Wise. Moreover, by that time there was no modification that would have enabled debtors to meet the terms of the contract anyway.

Although plaintiffs described debtors' "injury" to them as having to pay more for the property than they otherwise would have under the contract, they did not attempt to quantify the injury during the trial. As the court stated earlier the amount plaintiffs paid to acquire ownership

18

of the property was only $2,059.23 more than the payments required by the first "Rent to Own" document.  If plaintiffs are instead seeking to measure their injury by the payment structure under the second "Rent to Own" document, the difference would be $20,373.30.  That amount is $5,844.90 more than plaintiffs paid debtors under the contract and fails to take into account the financial benefit plaintiffs received from living in the Myrtle Street house for almost three years without making any payment to anyone.  By whatever measure, plaintiffs' injury was foreseeable and assumed as a part of the risk in entering the contract.  Plaintiffs' claim is not the type that falls within the scope of § 523(a)(6).  If it were, every knowing breach of contract would be nondischargeable, and that is not the standard for a "willful and malicious injury" under § 523(a)(6).  *See, e.g., In re Best*, 109 F. App'x at 3 ("The willful and malicious standard is a stringent one.").  Plaintiffs failed to establish their claim is nondischargeable under § 523(a)(6).

Finally, debtors sought by motion an award of damages from plaintiffs for violation of the discharge injunction in connection with plaintiffs' filing and pursuit of both the state court action and this one.  Debtors were unsuccessful in proving plaintiffs had notice or actual knowledge of the case in time to meet the deadline for filing complaints to determine dischargeability.  The court concluded that plaintiffs first became aware of debtors' bankruptcy filing and discharge sometime in October 2021 when plaintiffs were served with the motion for summary judgment in the state court action.  After learning of the discharge plaintiffs moved to this court for the purpose of commencing this adversary proceeding to determine the dischargeability of their claim.  Plaintiffs' actions in connection with the state court action and this adversary proceeding were in no way improper.  Debtors' motion will be denied.

IV.

The foregoing are the court's findings of facts and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1), made applicable by Fed. R. Bankr. P. 7052.  These matters are core proceedings as set forth in 28 U.S.C. § 157(b)(2)(I) and (O), and the attorneys for the parties confirmed that the court has the authority to enter final orders therein.  Accordingly, an order will be entered contemporaneously with the filing of this memorandum opinion denying that plaintiffs' claim is excepted from discharge under either 11 U.S.C. § 523(a)(2)(A) or (6) and denying debtors' motion in the underlying bankruptcy case.

# # #

20